## PIERCE PETROLEUM CORP. et al. v. OSAGE COAL CO.

No. 18083. Opinion Filed July 17, 1928.

Rehearing Denied Nov. 20, 1928.

A. C. Markley, for plaintiffs in error.

James H. Gordon and Monk & McSherry, for defendant in error.

DIFFENDAFFER, C. For a number of years, prior to June 1, 1918, a corporation known as the Osage Coal & Mining Company of McAlester, Okla., had been in the hands of a receiver in an action pending in the United States District Court of the Eastern District of Oklahoma. The action was for the foreclosure of a mortgage. The debts of the company consisted of $400,000 first mortgage bonds, with a large amount of past-due interest, and about $89,000 in unsecured notes and accounts payable. About June 1, 1918, the bondholders appointed a committee to arrange a plan for the reorganization of the company. The bondholders had obtained a judgment of foreclosure, and the unsecured creditors, including the plaintiffs in this action, had also obtained judgment on their claims, aggregating $79,694.82. The reorganization committee mailed the following letter to the unsecured creditors:

"1015 Federal Reserve Bank Bldg."
"St. Louis, Mo. June 1, 1918.

'To The Unsecured Creditor Osage Coal & Mining Company:

"Gentlemen:

"In September, 1913, upon the death of Wm. Busby, principal owner of the Osage Coal & Mining Company, Mr. Busby's affairs and the affairs of the Osage Company were found to be in great confusion.

"It was hoped for a time that it would be possible to rehabilitate the company without receivership, but because of the attitude of some of the creditors of the company, this was found impossible—and on July 30, 1914, upon proceedings in the U. S. District Court of Oklahoma, Mr. James Duncan was appointed receiver, and the property has been administered by the receiver since that date.

"The debts of the Osage Company consist of:

"First Mortgage Bonds Outstanding _____$400,000.00

"Unsecured Notes and Accounts Payable _____ 79,694.82

"The bondholders have deposited their bonds with a reorganization committee, and it is proposed to terminate the receivership by foreclosure sale, and reorganize the business.

"The bondholders' committee of reorganization expect to bid for and purchase the property of the Osage Coal & Mining Company at such sale, and the plan herein out-

132

lined is subject to the purchase of the committee of the property at such sale.

"In behalf of the bondholders committee, a new corporation will be formed to take over the property so purchased.

"The new company will create a new mortgage to secure an issue of first mortgage 10-year 6% bonds amounting to $400,000.

"The holders of the Osage Coal & Mining Company bonds have agreed to accept $200,000 in new bonds in place of their present holdings of $400,000. The remaining $200,000 of the new issue will be reserved in the treasury of the new company to provide for possible future requirements for new equipment and development.

"The bonds of the new company will carry interest at the rate of 6% per annum, payable semi-annually, and the mortgage will provide for a sinking fund of $20,000 per annum to be applied annually to the payment and cancellation of bonds. If any of the bonds to be held in reserve, as above described, are issued at some future time, the sinking fund payments will then be correspondingly increased.

"The present bondholders, acting through the reorganization committee, propose to give to assenting unsecured creditors of the Osage Coal & Mining Company noninterest-bearing income debentures for the full amount of their claims. This proposition has already been accepted by the holders of a very large majority in amount of the unsecured debts.

"The board of directors will, from time to time, as in their judgment surplus income becomes available for that purpose, order payments in liquidation of these debentures. Such payments will be made pro rata and the payment indorsed upon the debentures. The debentures will be registered and transferable by indorsement.

"No dividends will be declared or paid upon the capital stock until the entire issue of debentures shall have been paid off and canceled or provided for and called for payment.

"G. L. Blackford,
"Chas. E. Kimball,
"Richard Stout,
"Reorganization Committee."

The proposition was accepted by plaintiffs, and each of them assigned their claim against the Osage Coal & Mining Company to the reorganization committee. In pursuance of the plan of reorganization, the bondholders procured an order of sale under which the property and assets of every description belonging to the Osage Coal & Mining Company were sold to Charles E. Kimball, a member of the reorganization committee, as trustee, for the sum of $400,000, which he paid by surrendering bonds in that amount. He also assumed certain obligations of the receiver, etc., which, however, were paid out of funds in the hands of the receiver.

Mr. Kimball, as such trustee, operated the mines, etc., until the new company, Osage Coal Company, defendant herein, was organized and took over the business, the property being conveyed to it on or about January 25, 1919.

On May 29, 1920, there was issued to the several plaintiffs noninterest-bearing debenture certificate, the one to the Pierce Oil Corporation being as follows:

"Osage Coal Company.
"No. 14.  $834.20.
"Non-Interest-Bearing Debenture Certificate.

"The Osage Coal Company, pursuant to agreement with bondholders' committee of reorganization, Osage Coal & Mining Company, providing for liquidation of unsecured notes of and claims against Osage Coal & Mining Company heretofore assigned to said committee, pursuant to circular of committee June 1, 1918, undertakes as follows:

"The Osage Coal Company agrees with the registered holder of this certificate and the registered holders of other certificates of like tenor, that the Osage Coal Company will, by action of its board of directors, from time to time hereafter, when, as in the discretion of said board of directors, there shall be surplus earnings of the company available for the purpose, declare from such surplus earnings, distribution to retire debenture certificates not exceeding in the aggregate $80,000.

"This certificate is registered in the name of: Pierce Oil Corporation in the amount of $834.20, which is to be discharged pro rata with other certificates of like tenor, not exceeding the aggregate of $80,000 under the terms above stated.

"Payments in liquidation of this certificate will be indorsed hereon, reducing the principal sum accordingly.

"No dividend will be declared on the capital stock of the coal company until this entire issue of certificates shall have been retired and canceled, as above, or called for retirement by resolution of the board of directors.

"This certificate, and all benefits hereunder, may be transferred upon the books of the company upon its presentation on and surrender at the office of the company, signed in accordance with the transfer on

the back hereof, and a new certificate will be issued in place hereof.

"St. Louis, Mo., May 29, 1920."

"Osage Coal Company, by James Duncan, President.

"Attest: Chas. E. Kimball, Secretary.

Indorsed on Back:

"No. 14, Osage Coal Company. Non-Interest-Bearing Debenture Certificate $834.29. Pierce Oil Corporation, Registered Owner.

"Payments in Liquidation.

-----------------------------------------

"For value received, the undersigned hereby sell, assign and transfer to Pierce Petroleum Corporation all right, title and interest in the within debenture, and any amount that may be due thereunder, and do hereby irrevocably constitute and appoint _____ attorney to transfer the said debenture on the books of the within named company, with full power of substitution in the premises.

"Pierce Oil Corporation. By H. B. Thorne, Vice President.

"In the presence of J. L. Spear, Secy.

" (Seal)."

The name of the Pierce Oil Corporation was afterwards changed to Pierce Petroleum Corporation, and the debenture assigned accordingly.

When the Osage Coal Company was organized, it issued to the bondholders of the old company in lieu of the $400,000 in bonds of the old company, $200,000 bonds of the new company, and $200,000 capital stock of the new company, and provision was made for the issuance of an additional $200,000 of bonds to be retained in the treasury to "provide for possible future requirements for new equipment and development." None of the latter bonds were ever used. The $200,000 bonds that were issued drew interest at 6 per cent. per annum, and the principal was due and payable $20,000 each year for ten years.

On May 2, 1925, plaintiff Pierce Petroleum Corporation filed suit in the district court of Pittsburg county to recover the $834.20 represented by its debenture certificate. The petition alleged the issuance and delivery of the debenture, a copy of which and a copy of the reorganization committee's circular letter were attached to the petition as exhibits and made part thereof. The petition then alleged that in accordance with the terms of the debenture and cir-

cular letter, there had accrued and was held by defendant in 1919 and 1920, and ever since, surplus earnings of the company that are and were applicable to the payment of the debentures. Proper allegation of the change of name of plaintiff, and the assignment of the debenture to plaintiff in its new name, and the ownership of the debenture by plaintiff and demand for payment and refusal thereof were contained in the petition.

On October 12, 1925, Graham, Fultz & Garrett filed a petition in intervention on the same reorganization agreement, and a debenture held by it. On the same date, McAlester Grocery Company filed a similar suit to recover on a debenture held by it. On March 16, 1925, the Southwest General Electric Company and the Western Electric Company each filed a similar petition to recover on a debenture held by each of them. On May 3, 1926, all the actions were consolidated for trial with that of Pierce Petroleum Corporation against Osage Company, and they were tried together on the same evidence, but separate motions for judgment, judgments, and separate motions for new trial were filed. A stipulation was entered into at the trial that appeal to the Supreme Court should be perfected in cause No. 8622, Pierce Petroleum Corporation v. Osage Coal Company, and that judgments in the other causes abide the decision and judgment in such appeal. The petitions, demurrers, amended petitions and answers are similar in all the cases. Demurrers were filed to the petition and sustained by the court. Plaintiff thereafter filed an amended petition, the additional allegations being in substance:

"Plaintiff alleges that said reorganization committee entered into like contracts and the defendant corporation executed like debenture certificates, totaling some $80,000 to Western Electric Company, Southwestern Electric Company, McAlester Grocery Company and Graham, Fultz & Garrett, and to others whose names and addresses are unknown to plaintiff, but are known to the defendant corporation and its board of directors, and that such contracts, debentures and rights are shown on the books and records of said defendant. And prays the court to require defendant to make answer setting forth the names and addresses and amounts owning said debenture certificate holders as shown on its books and records that summons may issue to each of said other debenture certificate holders, and that they be made parties hereto that their rights to said fund may be determined.

"This plaintiff further avers: That said defendant corporation has, during the year 1919, 1920, and succeeding years, and each of said years, from the operation of its said business, accumulated surplus earnings greatly in excess of its expenses and the $20,000 providing for a sinking fund for the payment of its outstanding bonds and the bonds sold to provide for a new equipment and development. And which surplus was available during each of said years for the board of directors of said defendant corporation to declare dividends for distribution and payment on the debenture certificate holders. The said surplus earnings are shown on the daily, monthly and yearly balance sheets and records and books of said defendant, as this plaintiff verily believes (interlined), and cannot ascertain without examination of books and an accounting and asks that defendant be required to produce in court its said books, records and balance sheets showing said surplus earnings to be submitted in evidence. And that the defendant be required to make an accounting to this coourt of its said business and surplus earnings. Said defendant's board of directors, and James Duncan, its president, abused the discretion given them, and their contract duty in failing, neglecting and refusing to declare the dividends from the surplus funds of said defendant corporation available and make the payments to this plaintiff and the other debenture certificate holders."

The prayer was that the court require defendant and its board of directors to make an accounting of its business and surplus earnings for each of the years 1918 to 1925, inclusive.

Defendant answered by general denial, and after admitting its corporate existence, and the execution of the debenture certificate and the circular of the bondholder committee, alleged, in substance, that by the terms of the debenture the amount thereof is payable only upon action of the board of directors of defendant company, and only when and as in the discretion of the board there should be surplus earnings of the company available for that purpose; that the only obligation upon the part of the defendant is that it will not declare dividends on the capital stock until the entire issue of certificates has been retired or called for retirement by resolution of the board; that the company's business is that of mining and selling coal, which business is rendered extremely hazardous by reason of explosions and disturbance of the coal at the great depth at which the mining is carried on, causing what is known as "squeezes." necessitating great expense and shutdown of the mine for long periods of time; the demand for coal is variable; that the business is subject to great loss by reason of strikes of miners, etc.; that the properties of the company are covered by a large outstanding mortgage.

The answer then recited the receivership proceedings against the old company, and alleged that the property was not worth and would not sell for the amount of the first mortgage indebtedness, but that the bondholders, being desirous that the unsecured creditors be protected out of the profits said property should make as operated under a new company, "voluntarily and without consideration agreed as set out in the debenture certificate and the bondholders circular;" that the provisions were inserted in the certificate making payments thereon wholly discretionary with the board for the protection of the new company against interference in the operation of the property by holders of the certificates, but protected the interests of the unsecured creditors by the provisions against payment of dividends.

The answer further alleged that, from the nature of the business, it is necessary to keep on hands at all times a large sum of money as working capital, and also to meet extraordinary demands in times of shutdowns, strikes, and mining disasters; that in the judgment of the board of directors, it would be dangerous to the company to pay out at this time any of its surplus funds, and that the same must be retained to care for ordinary and extraordinary expenses; that it is ready and willing to pay dividends to the debenture holder whenever it feels that it is safe so to do; that defendant has acted in the utmost good faith, and has so operated its properties that a substantial sum has been accumulated to protect the company from disasters and provide for working capital, but that it has on hands no more than is reasonably necessary for such purpose.

Motion was filed by plaintiffs to strike certain portions of the answer, which was overruled. Plaintiffs replied by general denial, and the cause was tried to the court without a jury, resulting in a finding and judgment for defendant, from which judgment plaintiffs prosecute this appeal.

The first assignment is that the trial court erred in sustaining the demurrer to the original petition. The action pleaded in the original petition was an action at law based solely upon the debenture certificate and the letter of the reorganization committee to the

unsecured creditors of the old corporation. It is contended that the debenture certificate is an obligation to pay, and under the law was due and payable in a reasonable time from the date of the contract. In 14A C. J. 1050, the following general rule is stated:

"The general rule is that, where the reorganization follows a valid foreclosure, the new corporation is under no obligation with respect to the liabilities of the old corporation which did not have priority over the mortgage foreclosed, unless such liability is assumed by the new corporation or is imposed by the decree of foreclosure or by statute."

The liability was not imposed by the decree of foreclosure nor by statute. The only liability, therefore is that voluntarily assumed. The only obligation is as stated in the certificate and letter that the Osage Coal Company will, by action of its board of directors, from time to time, when, and as in the discretion of said board, there shall be surplus earnings of the company available for that purpose, declare from such surplus earnings distribution to retire the debenture certificate.

The agreement or obligation is similar to that which the law implies in favor of a common stockholder for the payment of a dividend. When a corporation has net or surplus profits, unless some restraint is imposed by statute, charter, by-laws or contract, or otherwise, whether a dividend shall be declared, and if declared the amount thereof, rests in the sound discretion of the directors. 14 C. J. 808.

By the express provision of the debenture certificate, the declaration of a distribution to retire the debenture in whole or in part is placed within the sound discretion of the board of directors. Though the matter is within the discretion of the board, the board of directors would not be permitted to use their power illegally, oppressively or wantonly or arbitrarily. So where there are net or surplus profits out of which a dividend may be declared, and the board of directors fraudulently refuse or neglect to declare and pay a dividend, a court of equity will compel them to do so. 14 C. J. 813. So applying this rule, and we think it is applicable in the instant case, in the absence of any allegation that the board of directors had abused their discretion, or were acting fraudulently, wantonly, oppressively, or arbitrarily in refusal to declare a. distribution, we think the petition failed to state a cause

of action, and that it was not error to sustain the demurrer.

Complaint is also made that the court erred in refusing to sustain the motion of plaintiffs to strike certain portions of the answer of defendant. The motion could have properly been sustained in part, as to the allegations concerning the receivership, etc., of the old company, but from an examination of the whole record, we do not think that plaintiffs' rights were materially affected by the ruling of the court, and plaintiffs do not point out wherein they were injured, or their rights were materially affected by the denial of their motion.

Complaint is made of the admission of certain digest statements of the company's business, as made by the witness T. T. Brewster. The digests were a part of the deposition of the witness Brewster taken in St. Louis, Mo., and attached to his deposition. Plaintiff was represented by counsel at the taking of the deposition, and no objection to these digests was made at the time, and objection was thereby waived. Section 630, C. O. S. 1921; Okla. State Bank of Cushing v. Buzzard, 73 Okla. 250, 175 Pac. 750.

Complaint is also made of the admission of certain statements of the defendant's business as digested and tabulated by the witness Miller, who was a bookkeeper for defendant at Krebs, Okla., the objection being that this was all secondary evidence. The books from which the compilations or digests were made were all before the court at the time. The books themselves were very voluminous, and plaintiff was permitted to cross-examine the witness thoroughly. We think the witness qualified as an expert, and these digests reflected his opinion as an expert as to the condition of the company's business, as shown by the books.

An expert accountant who has examined certain books and schedules which have been introduced in evidence may state the result of his computation therefrom. 22 C. J. 537. This was an equity case in the nature of an accounting, wherein it was sought to show the financial condition of a corporation, involving transactions covering a period of about eight years, during which time the company had handled a business amounting to nearly $4,000,000. To have placed the entire set of books in evidence, and require the trial court to examine same, item by item. would have required a great deal of time. and unless the trial judge was an expert accountant, would

136

have been of little benefit to the court, and would have made a very voluminous record to present here for review. We think the only practical method of getting the facts before the court was that adopted by the trial court. Counsel does not point out wherein plaintiff was prejudiced by the evidence, and we are unable to see how it was injured thereby, since the books were all before the court, and plaintiff was given every opportunity to cross-examine the witness.

The other assignments of error may all be considered in determining whether the finding and judgment of the trial court was supported by the evidence. The single question for the trial court to determine, as we view it, was, Did the board of directors abuse their discretion in refusing to declare a distribution for the benefit of the holders of the debenture certificates?

We have examined the entire record, consisting of nearly 600 pages, and conclude that the findings and judgment are not clearly against the weight of the evidence. To review all the evidence would require more space than we feel justified in devoting to this case. In substance, the evidence shows that when the assets of the old company were sold, they were appraised at $410,000. They consisted of seven departmental coal mining leases located in Pittsburg county. These leases are to expire in 1931, appraised at $140,000, machinery, equipment, mules, supplies, and other property, appraised at $145,000, and bills receivable, $125,000. These assets were sold to Kimball, as trustee, and delivered to him September 14, 1918. He operated the business as such trustee until about January 25, 1919, when the defendant company took the business over. The new company was capitalized at $200,000. Six per cent. bonds were issued maturing $20,000 each year for 10 years, and $78,-635.90 in debenture certificates were issued.

In the property account of the company, the cost of the property was carried at $480,-000. The evidence shows that the business was conducted at considerable profit for a few years. At the close of 1924, the margin of income over operating expenses was about $520,000. In 1925, to August 31st, the excess of operating expenses over income was $16,732 01. The company had set aside each year the $20,000 to pay off the bonds falling due. The plan adopted was to set aside enough money out of the income to retire the bonds in ten years, that is, one-tenth of the bonds each year. They also set aside what they termed a depreciation and obsol-

escence fund, this being based upon the fact that the leases would expire in 1931, after which the company must cease operations. The depreciation and obsolescence fund was to be created by setting aside from the income one-twelfth of the amount of the capital stock and $80,000 debenture certificates, so that when the leases expired, the company would have sufficient money to retire the capital stock, pay off the debentures, and the balance, if any, to be distributed to the stockholders in dividends.

The earnings for the first three years were considerably in excess of the amount required for that purpose, and the board of directors purchased bonds of the company before they matured to the amount of about $43,000, or possibly at one time they had bought $63,000 of bonds before they became due. At the time of the trial the company held $23,000 of these bonds that had not matured.

It was this method of handling the income that plaintiff contended was an abuse of discretion. It was contended that the company had no right to invest its earnings in its bonds before their maturity, or to accumulate a fund to retire the capital stock until the debentures were retired.

It is contended by the defendant that, because of the hazardous nature of the business, and the probability of the company at any time incurring great losses by mine disasters, strikes, shutdowns, etc., good business judgment demanded that the company keep in reserve large sums of money to meet and care for such losses.

On March 31, 1926, shortly before the trial, the net surplus on hand was about $19,500. The company, however, held $23,000 of its bonds which had not matured. The record disclosed that for the year 1924, the losses were $38,000, and for the year 1925, the loss was about $60,000.

It is contended by the plaintiff that the debenture should be retired before any payment is provided for the stockholders. That is, that the one-twelfth of the amount of the capital stock, which the company has set aside each year for the purpose of paying off the stockholders in 1931, when the company must cease doing business by reason of the expiration of their coal mining leases, should be used now to retire the debenture. In other words, that the debenture holders are to be preferred over the stockholders. On the other hand, the defendant claims that a fund should be provided to retire the capi-

tal stock, and that in the event there should not be enough at the expiration of the leases to pay both stockholders and debenture holders, the stockholders should be paid first.

As to which of these positions is correct, we deem it inadvisable at this time to decide. The finding of the trial court was that there was not sufficient evidence to show fraud or abuse of discretion on the part of defendant, or its board of directors, and that upon the whole evidence the defendant was entitled to judgment.

We have carefully examined the whole record, and in view of the fact that the evidence discloses that during the three years next preceding the trial the company sustained loss, due largely to strikes of the mineworkers, of approximately $140,000, and at the time of the trial the company's cash was reduced to about $19,000, with some $37.000 of first mortgage bonds to provide for before January, 1929, we do not think that the findings and judgment of the trial court are clearly against the weight of the evidence.

The judgment should be affirmed.

TEEHEE, HALL, LEACH, and HERR, Commissioners, concur.

By the Court: It is so ordered.